The **READING COMPANY,**

v.

The **CITY OF PHILADELPHIA, et al.**

No. 91–2377.

United States District Court, E.D. Pennsylvania.

March 9, 1993.

Memorandum Denying Reconsideration May 21, 1993.

## MEMORANDUM AND ORDER

YOHN, District Judge.

The Reading Company ("Reading") commenced a suit against the defendants under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C.A. §§ 9601–9675 and the Pennsylvania Hazardous Sites Cleanup Act, 35 Pa.S.A. §§ 6020.101–6020.-1305. Reading seeks contribution from the defendants for their share of the $8.6 million in clean-up costs already incurred by it, as well as any future costs incurred, in removing PCB contamination from the viaduct which formerly bore tracks of the Ninth Street branch of the Reading Railroad to the Reading Terminal train shed, the Reading Terminal train shed, the structures associated with that train shed, the structural components of the train shed, and the interstitial materials lying between the floor of the train shed and the ceiling of the Reading Terminal Market. Defendant City of Philadelphia (the "City") filed a motion for summary judgment. Reading, in reply, filed a cross-motion for summary

judgment on one issue, whether Reading's bankruptcy discharged the City's contractual indemnification claims. For the reasons explicated below, the City's motion is granted in part and denied in part. Reading's cross-motion is granted.

## DISCUSSION

### I. The Facts

Reading operated both freight and passenger rail service. Its passenger service was extant in 1893 and perhaps earlier.

For many years, Reading ran steam-powered locomotives on its passenger lines. Around 1930, Reading commenced electrification of its rail lines. The company electrified the last of its passenger lines in 1961.

Reading utilized self-propelled electric railroad cars on the electrified rail lines. The electric railcars housed traction motors that in turn contained electrical transformers. These electric transformers contained oils mixed with polychlorinated biphenyls ("PCBs").

Due to both the normal operation of these transformers and leaks in them, the electric railroad cars released PCBs into the railbeds underneath them. As a result of this continued leakage, the train shed (including the Reading Terminal train shed, the structures associated with that train shed, the structural components of the train shed, and the interstitial materials located between the floor of the train shed and the ceiling of the Reading Terminal market) and the viaduct that formerly bore the tracks of the Ninth Street branch of the Reading Railroad to the train shed became contaminated with PCBs.

During the 1950's, Reading suffered a severe decline in the number of passengers using its commuter rail lines. This decline in riders jeopardized the continued viability of commuter rail operations between Philadelphia and the nearby counties of southeastern Pennsylvania—Bucks, Chester, Delaware, and Montgomery.

In response to the threatened discontinuance of commuter service between Philadelphia and the surrounding counties, in 1958, the City entered into a series of contracts with Reading to increase service and decrease fares on selected rail lines, mostly within the city limits. By the end of 1960, the City created the Passenger Service Improvement Corporation ("PSIC") to manage the plan to increase service and decrease fares on the six in-city rail lines.

Realizing that the burgeoning mass transportation crisis necessitated a regional approach to the problem, in September 1961, Bucks, Chester, and Montgomery counties joined with the City to form the Southeastern Pennsylvania Transportation Compact ("SEPACT"). SEPACT planned to increase ridership on commuter rail lines by increasing the quality and quantity of service and decreasing fares.

SEPACT applied for and received a demonstration grant from the Housing and Home Finance Agency ("HHFA") (later replaced by the Urban Transportation Administration under the U.S. Department of Housing and Urban Development) pursuant to the Housing Act of 1961. The first demonstration project, christened SEPACT I, commenced during the last week of October 1962 and lasted for three years, ending in October 1965. The project cost 4.7 million dollars, two-thirds of which was paid for by the federal government and the remaining one-third of which was contributed by the local participants.

Reading's Philadelphia to Lansdale line and its Glendale to Hatboro branch, along with the Pennsylvania Railroad's commuter service between Philadelphia and Levittown, served as demonstration lines for SEPACT I.

Although SEPACT I successfully increased ridership on the demonstration lines, overall the volume of commuters riding on the Reading system declined. Because of the continued passenger deficit, Reading applied for service abandonments.

In response to the escalating mass transportation crisis, SEPACT III, known as Operation Reading, evolved. This project's goal was to increase ridership on all seven of Reading's commuter lines. Operation

Reading commenced in April 1965 and terminated in October 1966.

In 1964, the Southeastern Pennsylvania Transportation Authority ("SEPTA") formed. Incorporated pursuant to the Urban Mass Transportation Law, SEPTA was created as an agency of the Commonwealth of Pennsylvania, although it was subsidized by a number of sources, including the City. In November 1965, SEPTA assumed management of SEPACT's programs thereby becoming SEPACT's managing agent.

Reading subsequently went bankrupt and in 1976, pursuant to a final system plan required by the Regional Rail Reorganization Act, conveyed most of its property to the Consolidated Rail Corporation ("Conrail") and SEPTA. However, it retained a reversionary interest in certain property, including the property at issue here. Reading ceased all railroad services on March 31, 1976.

When the properties in question reverted to Reading in 1985, Reading discovered the PCB contamination and commenced remediation.

## II. CERCLA Claims

The Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") permits private parties to bring cost recovery suits against statutorily defined responsible parties for the costs that they have incurred in cleaning up hazardous substances. 42 U.S.C.A. § 9607(a)(4)(B) (West 1983 and Supp.1992); *Philadelphia v. Stepan Chem. Co.*, 544 F.Supp. 1135 (E.D.Pa.1982).

█ In order to make out a cost recovery claim under § 9607(a)(4)(B), a plaintiff must prove the following elements: (1) the defendant comes within one of the four classes of "covered persons" identified in § 9607(a)(2), (2) there is a release or threatened release of hazardous substances from a facility, (3) the release or threatened release caused the plaintiff to incur response costs, (4) the costs incurred were the necessary costs of response, and (5) the response costs incurred were consistent with the national contingency plan. 42 U.S.C.A. § 9607(a); *Artesian Water Co. v. Govern-*

*ment of New Castle County*, 659 F.Supp. 1269, 1278 (D.Del.1987), *aff'd* 851 F.2d 643 (3d Cir.1988). Section 9601 defines many of the terms used above. 42 U.S.C.A. § 9601.

If a party is determined to be a responsible party and the other required elements are present, then liability is strictly imposed. *U.S. v. Alcan Aluminum Corp.*, 964 F.2d 252, 259 (3d Cir.1992); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1150 (1st Cir.1989); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1042 (2d Cir.1985).

The City marshals a plethora of arguments in support of its contention that it is not a covered person as defined by CERCLA. The statute defines the two categories of covered persons pertinent to the present motion as follows:

(a) **Covered persons, scope**

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, . . .

42 U.S.C.A. §§ 9607(a)(2), (3) (West Supp. 1992).

## III. Standard for Granting Summary Judgment

Summary judgment is appropriate if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Small v. Seldows Stationery*, 617 F.2d 992, 994 (3d Cir.1980). The court does not resolve questions of disputed fact, but simply decides whether there is a genuine issue of fact which must be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Ettinger v. Johnson*, 556 F.2d 692 (3d Cir.

1977). The facts must be viewed in the light most favorable to the opposing party, and reasonable doubt as to the existence of a genuine issue of material fact is to be resolved against the moving party. *Continental Insurance Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury, or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 252, 106 S.Ct. at 2512.

## IV. Issues Presented

Reading seeks to impose CERCLA liability on the City in connection with both the City's ownership of certain railcars and the City's subsidization of Reading. Because of the numerous theories of liability asserted and the numerous defenses thereto, the court will discuss separately the alleged liability stemming from the railcars and the alleged liability rooted in the subsidy arrangements. However, the City also makes arguments against the imposition of liability that apply to both areas of alleged liability. Therefore, these overarching arguments will be discussed initially.

## V. Sovereign Immunity

■ The City argues that since it is a "sovereign acting for the public's benefit," it remains immune from CERCLA liability. City's Memorandum in Support of Its Motion for Summary Judgment at 24. Neither CERCLA's language nor cases interpreting the statute provide even a modicum of support for the City's contention. Therefore, the court denies the City's motion for summary judgment on this issue.

First, the City maintains that its involvement with public transportation should be characterized as action taken in its sovereign capacity, rather than in its business capacity. Second, the City contends that CERCLA insulates from liability public entities acting in their sovereign capacities.

CERCLA imposes liability on any "person" who commits statutorily proscribed acts. CERCLA defines "person" as follows:

> The term 'person' means an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, **political subdivision of a State,** or any interstate body.

42 U.S.C.A. § 9601(21) (West Supp.1992) (emphasis added).

Clearly, the City is a political subdivision of the state of Pennsylvania. The City does not dispute its status as such.

Moreover, two specific statutory exceptions to the imposition of liability on state and local governments bolster the clear language of the statute including governmental entities within its scope. The first exception to the imposition of liability on state or local governments states:

> The term "owner or operator" does not include a unit of State or local government which acquired ownership or control involuntarily through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government involuntarily acquires title by virtue of its function as sovereign. **The exclusion provided under this paragraph shall not apply to any State or local government which has caused or contributed to the release or threatened release of a hazardous substance from the facility, and such a State or local government shall be subject to the provisions of this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title.**

42 U.S.C.A. § 9601(20)(D) (West Supp.1992) (emphasis added).

CERCLA also exempts government entities from liability when they engage in the cleanup of hazardous wastes. This exception provides:

No State or local government shall be liable under this subchapter for costs or damages as a result of actions taken in response to an emergency created by the release or threatened release of a hazardous substance generated by or from a facility owned by another person. This paragraph shall not preclude liability for costs or damages as a result of gross negligence or intentional misconduct by the State or local government....

42 U.S.C.A. § 9607(d)(2) (West Supp.1992).

CERCLA's clear language does not support the City's argument. Neither does the pertinent case law. Courts interpreting CERCLA, including the Supreme Court, have concluded that state and local governments[1] can be covered persons under CERCLA. *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 7–13, 109 S.Ct. 2273, 2277–80, 105 L.Ed.2d 1 (1989); *B.F. Goodrich Co v. Murtha*, 958 F.2d 1192, 1198–99 (2d Cir. 1992). Therefore, the City's claim that it was acting in its "sovereign status" simply provides no defense to CERCLA liability. *B.F. Goodrich*, 958 F.2d at 1199 ("To construe CERCLA as providing an exemption for municipalities arranging for the disposal of municipal solid waste that contains hazardous substances simply because the municipality undertakes such an action in furtherance of its sovereign status would create an unwarranted break in the statutory chain of responsibility.").

The City does cite a number of cases where courts declined to impose CERCLA liability on a government when it acted in its "sovereign capacity." Such cases are inapposite. The facts of cases declining to impose CERCLA liability on a government or government agency because it acted in its sovereign capacity, instead of its business capacity, exclusively involve incidents in which a party sued or brought counterclaims against a government in connection with government efforts to clean up hazardous wastes created and disposed by others. *See, e.g., U.S. v. Atlas*, 797 F.Supp.

411, 421 (E.D.Pa.1992) ("The reason that the waiver [of sovereign immunity] found in § 9620 does not extend to response or remedial actions taken by the EPA is that, when the EPA undertakes such actions, it is not acting like a private party; it is acting to ameliorate a dangerous situation that, but for the prior actions of the generators and transporters of waste, would not exist."); *United States v. Berks Assoc., Inc.*, 1992 WL 68346, 1992 U.S.Dist. LEXIS 4978 (E.D.Pa.1992) (holding that EPA cannot be sued under CERCLA for clean-up operations it began pursuant to the Clean Water Act).

The gravamen of courts' analyses in such cases is that a government, unlike private parties, has a regulatory and response duty to assume a clean-up role. Therefore, since a government, unlike private entities, must act to remedy environmental crises, a government cannot, in such circumstances, be considered an owner, operator, or arranger for CERCLA purposes.

Clearly in the case before this court, the City has not engaged in an environmental cleanup. Being motivated by the goal of providing public transportation for its citizens and visitors will not shield the City from liability if it acted as an owner or operator of a facility or arranged for the disposal of hazardous wastes at a facility.

## VI. Passive Versus Active Disposal

■ The City argues that it cannot be considered as an owner or operator or arranger at the time of a disposal of hazardous substances because the term disposal, as used in CERCLA, does not encompass "passive" releases. Unfortunately for the City, this argument is completely irrelevant to the facts of the case at hand. Therefore, the court denies the City's motion for summary judgment based on this contention.

A split of authority exists concerning the issue of liability for so-called passive re-

---

1. Under federal law, "there is no tradition of immunity for municipal corporations." *Owen v. Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980). Moreover, state laws granting municipalities immunity

from suit do not control the application of federal law. *Monell v. Dept. of Social Services*, 436 U.S. 658, 695 n. 59, 98 S.Ct. 2018, 2038 n. 59, 56 L.Ed.2d 611 (1978).

leases of hazardous substances. Some courts have held that such passive releases constitute a disposal for CERCLA purposes. *See, e.g., Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 844–46 (4th Cir.1992). Others have rejected the notion that passive releases constitute disposals under CERCLA. *See, e.g., United States v. Petersen Sand and Gravel, Inc.*, 806 F.Supp. 1346 (N.D.Ill.1992).

When federal courts have held that a passive release of hazardous substances did not constitute a disposal for CERCLA purposes, the cases involved scenarios where no disposal activity occurred during the period of alleged liability. Rather, during the period in question, waste, previously disposed of at the facility, migrated or leached into the soil or water thereby creating a contamination problem. *See, e.g., Petersen*, 806 F.Supp. 1346 (leaking and leaching of hazardous substances from barrels disposed at the facility prior to company's operation constitutes passive disposal for which no CERCLA liability attaches); *Ecodyne Corp. v. Shah*, 718 F.Supp. 1454, 1457 (N.D.Cal.1989) (CERCLA only provides "an action against prior owners or operators who owned the site at the time the hazardous substances were introduced into the environment."); *Snediker Developers Ltd. Partnership v. Evans*, 773 F.Supp. 984, 989 (E.D.Mich.1991) ("[T]he mere migration of hazardous waste, without more, does not constitute disposal." Therefore, owners of property where hazardous waste had been dumped by others sixteen years earlier were not responsible for the spread of the waste matter during their period of ownership.); *In re Diamond Reo Trucks, Inc.*, 115 B.R. 559, 565 (B.C.W.D.Mich.1990) ("[T]he mere ownership of the site during a period of time in which migration or leaching may have taken place, without any active disposal activities, does not bring [the defendant] within the liability provision of § 9607(a)(2).").

Within the confines of the case before this court, the dispute over whether CERCLA covers passive releases is academic because no passive releases are at issue. The active release at issue is the leakage of PCBs from the transformers of certain railcars. The City confuses passive release with active disposal that simply takes the form of leaks or spills.

CERCLA adopts the definition of disposal set forth in the Resource Conservation and Recovery Act. 42 U.S.C.A. § 9601(29). That act defines disposal as follows:

> The term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be omitted into the air or discharged into any waters, including ground waters.

42 U.S.C.A. § 6903(3) (West 1983).

The City cannot seriously argue that the leaking of PCBs from railcars does not constitute an active disposal. The ownership and operation of certain railcars and Reading's commuter lines, both of which led to the leakage of the PCBs, are the basis of Reading's attempt to impose liability on the City. The mere fact that the disposal in question occurred via a leak does not exonerate the City from liability. CERCLA, in fact, expressly adopts a definition of disposal that encompasses such unplanned events as spills and leakages. The City attempts to characterize the leakage of PCBs from the transformers of the railcars as passive disposal. The attempt fails. Clearly, as the above discussion of the relevant cases illustrates, passive disposal, a concept utilized by some courts to shield owners and operators who become involved with a facility after the disposal of hazardous waste occurred, refers to the leaking or migration of hazardous substances into the soil or water following their initial disposal. This case involves the initial disposal itself.

For the reasons outlined, the City's broad arguments against the imposition of liability fail. The City also proffers specific arguments as to why it cannot be considered an owner, operator, or arranger in connection with specific railcars or with Reading's commuter operations as a whole.

## VII. Was the City of Philadelphia an owner or operator of certain railcars used in Reading's commuter service or the arranger for the disposal of PCBs from these railcars?

The City offers a cornucopia of reasons why it cannot be properly characterized as an owner, operator, or arranger. Each reason will be discussed in turn.

### Bankruptcy and Contractual Indemnification Claims

■ The City moves for summary judgment on the basis of indemnity provisions contained within three lease agreements.[2] It maintains that under the terms of the leases,[3] Reading should indemnify the City for any potential CERCLA liability it has related to the leased railcars. Reading counters with the argument that the indemnification agreements do not cover CERCLA liability and moves for cross summary judgment claiming that, regardless of the scope of the indemnification agreements, any possible claims for indemnification were discharged by Reading's bankruptcy.

Reading maintains that the City's contractual indemnification claims, because they were contingent claims at the time of the bankruptcy, were discharged. Not surprisingly, the City takes the contrary position. In order to resolve this dispute this court must answer one question—were the City's claims for indemnification contingent claims at the time of the Consummation Order promulgated in Reading's bankruptcy?

In 1971, Reading filed a petition for bankruptcy under section 77 of the United States Bankruptcy Act, a section providing for the reorganization of railroads engaged in interstate commerce. 11 U.S.C. § 205 (repealed 1978). A Consummation Order in the Reading bankruptcy proceeding was entered on December 23, 1980, and became effective on December 31, 1980. The Consummation Order states:

> The Debtor ... as of the Consummation Date, be discharged and released forever from: (a) all obligations, debts, liabilities and claims against the Debtor, whether or not filed or presented, whether or not approved acknowledged or allowed in these proceedings and whether or not provable in bankruptcy, including without limitation taxes in respect of non-bankrupt leased lines and other subsidiaries which are being satisfied pursuant to the Plan and all claims assumed or guaranteed by the Debtor or enforceable against the property of the Debtor;

Consummation Order and Final Decree at p. 7–8, Reading's Appendix I, Exhibit O.

In *Schweitzer v. Consolidated Rail Corp. (Conrail)*, 758 F.2d 936 (3d Cir.1985), the Third Circuit addressed the issue of claims and discharges under section 77 of the Bankruptcy Act of 1898. The facts of the case are as follows. Employees of Reading Company and other defendants brought suit for personal injuries sustained as a result of exposure to asbestos during the course of their work for the railroad. Reading and the other defendants argued that any claims by the employees were discharged by the Consummation Order that reorganized the railroad. The employees contended that their claims arose after the consummation date and thus could not have been discharged.

---

2. The City moves for summary judgment based upon indemnification clauses contained in three leases—a 1962 lease, a 1963 lease, and a 1971 lease. Reading concedes that the 1963 lease concerned railcars that were not equipped with transformers containing PCBs. Clearly, the City cannot have any liability in connection with these railcars. Therefore, only the 1962 and 1971 leases remain relevant to this motion.

3. The indemnification clauses in the two leases are identical. The clause states:

> [Reading] agrees to defend, indemnify, reimburse and hold City or any successor and assign of this agreement harmless from any and all claims, demands, suits, judgments or causes of action on account of injury to or death of persons or loss or damage to property, except to City employees or agents or except where caused by the negligence of City or its employees or agents, which may result from or grow in any manner out of the management, control, use or operation of the Cars under this Lease whether or not the Cars are at the time in the possession of [Reading], except when in the possession of City, its successors or Assigns. City's Motion for Summary Judgment, Exhibit E at ¶ 25, Exhibit G at 12–13.

The Third Circuit explained section 77 of the Bankruptcy Act:

Section 77(b) in pertinent part provides that a plan of reorganization 'shall include provisions modifying or altering the rights of creditors.' 'Creditors' include 'all holders of claims of whatever character against the debtor of its property, whether or not such claims would otherwise constitute provable claims under this [Act].' 'Claims' include 'debts, whether liquidated or unliquidated ..., or other interest of whatever character.' 11 U.S.C. § 205(b) (repealed 1978).

Section 77(f) provides that confirmation of the reorganization plan is binding upon "all creditors secured or unsecured, whether or not adversely affected by the plan, and whether or not their claims shall have been filed, and if filed, whether or not approved, including creditors who have not as well as those who have accepted it.' Moreover if the plan so provides,

'[t]he property dealt with by the plan, when transferred and conveyed to the debtor or to the other corporation or corporations provided for by the plan, or when retained by the debtor pursuant to the plan, shall be free and clear of all claims of the debtor, its stockholders and creditors, and the debtor shall be discharged from its debts and liabilities.' 11 U.S.C. § 205(f).

*Schweitzer*, 758 F.2d at 941.

On the basis of its analysis of the statutory language above, the Third Circuit concluded that section 77 authorizes a broad discharge of claims against the debtor in order to provide a fresh start for a reorganized railroad. At the same time, the court noted that a plaintiff's rights can only be affected by the discharge of all claims against a debtor if the plaintiff had claims within the meaning of section 77 prior to the consummation date of the debtor's reorganization. *Id.*

Although the court found that the employees in the case before it did not have a claim prior to the consummation date, the court examined the possibility that the employees had a contingent claim that would have been discharged in the bankruptcy. This is the analysis relevant to the case before this court.

The Third Circuit noted:

Still, it has been held that, under certain circumstances, a person may hold a contingent claim and thereby be a creditor within the meaning of the Bankruptcy Act, even though he presently has no cause of action against the debtor. (citation omitted) This proposition follows from the broad language of section 77(b) which provides that 'claims' include 'interests of whatever character.'

*Id.* at 942.

In support of this contention, the Third Circuit discussed *In re Radio–Keith–Orpheum Corporation*, 106 F.2d 22 (2d Cir. 1939). In that case, a landlord leased space to a subsidiary of the debtor. There were guaranty agreements by the debtor that the rent would be paid in the event of default on the leases. The landlords maintained that since no default had occurred on the leases, they had no claim in the bankruptcy and the guaranties remained unaffected by it. The Second Circuit rejected their argument. It held:

The claims based on the debtor's guaranties were wholly contingent and indeterminate in amount, there having been no default under the leases and no predictable prospect of default. In ordinary bankruptcy such claims would not be provable or dischargeable to any extent. In a proceeding under section 77B, however, they are claims subject to reorganization.... [The landlords] therefore were not as a matter of law entitled to stand aloof and obtain a continuance of the guaranties unaffected by the reorganization, the equivalent of a preference for them over unsecured creditors with accrued or determinable claims. What they were entitled to was treatment as nearly like that accorded to ordinary unsecured creditors as the circumstances permitted.

*Radio–Keith–Orpheum*, 106 F.2d at 26–27 (citation omitted).

The Third Circuit concluded that the reasoning of the Second Circuit in the *Radio–*

*Keith–Orpheum* decision did not control the case before it because the Third Circuit did not find that "plaintiffs had 'interests' of any character before injury [from asbestos] manifested itself." *Schweitzer,* 758 F.2d at 943. The court explained:

> In our view, before one can have an 'interest' which is cognizable as a contingent claim under section 77, one must have a legal relationship relevant to the purported interest from which that interest may flow.

*Id.*

The court went on to distinguish the facts of the *Radio–Keith–Orpheum* case. The Third Circuit noted:

> In *Radio–Keith–Orpheum,* although there had been no breach of the lease agreement and thus there was no present cause of action pursuant to the guaranties, there was a guarantor-guarantee legal relationship from which an interest in the guaranty could flow. There is no legal relationship however, between a tortfeasor and a tort victim until a tort actually has occurred. The tortfeasor-victim legal relationship arises simultaneously with the cause of action in tort. Since we have said that there in no tort under F.E.L.A. until injury manifests itself, it follows that there was no legal relationship between plaintiffs and defendants relevant to plaintiff's future causes of action in tort from which an "interest" could flow.

*Id.*

In justification of its decision, the court stated:

> One who contracts with a debtor prior to reorganization bargains for a legal relationship with that debtor, relying on the debtor's pre-reorganization solvency. We agree that such a person should not be 'entitled to stand aloof' and avoid the consequences of the bankruptcy proceedings. In contrast, a tort plaintiff cannot in any reasonable way be said to have bargained for his cause of action.

*Id.* (citation omitted).

This court finds that the Third Circuit's holding in *Schweitzer* compels the conclusion that the City's contractual indemnification claims were contingent claims discharged by Reading's bankruptcy. The legal relationship from which the City's interest in indemnification flows is the contractual relationship forged prior to Reading's bankruptcy. The fact that the City happens to be asserting the indemnification provisions in response to Reading's CERCLA claims against it does not change the relevant legal relationship from the City's contractual relationship with Reading to a statutory relationship created by CERCLA. The Third Circuit's adoption of the *Radio–Keith–Orpheum* decision makes it clear that the City's contingent claims were discharged.

Dicta in two Third Circuit opinions also support the conclusion that indemnity agreements covering future occurrences constitute contingent claims at the time of bankruptcy. In *In re M. Frenville Co., Inc.,* 744 F.2d 332 (3d Cir.1984), the Third Circuit, in a case involving the automatic stay provision of the Bankruptcy Code, stated:

> When parties agree in advance that one party will indemnify the other party in the event of a certain occurrence, there exists a right to payment, albeit contingent upon the signing of the agreement. (citations omitted) Such a surety relationship is the classic case of a contingent right to payment under the Code—the right to payment exists as of the signing of the agreement, but is dependent on the occurrence of a future event.

*Id.* at 336–37 (citation omitted).

The court reiterated this dictum in *In re Remington Rand Corp.,* 836 F.2d 825 (3d Cir.1988). The Third Circuit stated:

> As this court stated in *In re Frenville,* the existence of a valid claim depends on: (1) whether the claimant possessed a right to payment; and (2) when that right arose. (citation omitted) For example, an indemnity or surety agreement creates a right to payment, albeit contingent, between the contracting parties immediately upon the signing of the agreement.

*Id.* at 830 (citation omitted).

The City claims that another Third Circuit decision, *In re Penn Cent. Transp.*

*Co.,* supports its contention that its claim did not arise until after Reading's bankruptcy. This court finds *Penn Central* to be distinguishable from the facts in the instant case.

In *In re Penn Cent. Transp. Co.,* 944 F.2d 164 (3d Cir.1991), the Third Circuit held that CERCLA claims could be brought against a reorganized debtor. The facts of that case are as follows. Penn Central Transportation Company filed for bankruptcy in 1970, pursuant to section 77 of the Bankruptcy Act. On October 24, 1978, the district court issued a Consummation Order and Final Decree which prohibited future lawsuits against the reorganized debtor. The decree specifically precluded suit "on account of or based upon any right, claim or interest of any kind or nature whatsoever which any such person ... may have in, to or against any of the Debtors...." *Id.* at 165.

In the wake of PCB contamination discovered at a rail yard, the Paoli Yard, the United States filed CERCLA claims against SEPTA, Conrail, and Amtrak. Conrail wished to assert CERCLA claims for contribution and indemnity against Penn Central. The United States requested leave to sue Penn Central directly. The district court found that the Consummation Order and principles of bankruptcy prevented the assertion of such claims against Penn Central.

The Third Circuit reversed. In its opinion, the Third Circuit noted its general agreement with the principle that finality is of paramount concern in bankruptcy proceedings. *Id.* at 167. At the same time, the court noted that it had created an exception to finality in *Schweitzer.*

The court then reapplied the steps of its analysis in *Schweitzer.* The Third Circuit repeated its rule that "before one can have an interest which is cognizable as a contingent claim under section 77, one must have a legal relationship relevant to the purported interest from which that interest may flow." The court concluded that the petitioners did not have contingent claims prior to the consummation date. The court stated:

[I]t was not until the passage of CERCLA that a legal relationship was created between the petitioners and PCC relevant to the petitioners' potential causes of action such that an interest could flow. Because the legal relationship did not evolve until after the Consummation Date, the petitioner did not have contingent claims against PCTC. Accordingly our decision in *Schweitzer* leads us to the conclusion that the petitioners' asserted claims under CERCLA did not constitute dischargeable claims within the meaning of section 77 and thus survive the discharge of the debtor.

*Id.* at 167–68.

As the Third Circuit made clear in *Schweitzer* and *Penn Central,* the key issue in the case before this court is when the legal relationship relevant to the City's claims for indemnification arose. The City argues that the relevant legal relationship is that created by CERCLA. However since the City attempts to assert an indemnification claim, albeit based on Reading's CERCLA suit, the relevant legal relationship is the indemnification agreement itself. Since the City was cognizant of the fact that it might have some type of future claim for contractual indemnification against the City, it was required to assert a contingent claim during the course of Reading's bankruptcy.

The City offers a number of alternative arguments to save its contractual indemnification claims. They all fail.

■ First, the City argues that it is entitled to assert its contractual indemnification claims as a setoff to Reading's CERCLA claims against it. The Supreme Court has held that setoffs usually are not permitted in railroad reorganizations under section 77 of the Bankruptcy Act. *Baker v. Gold Seal Liquors, Inc.,* 417 U.S. 467, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974).

The Third Circuit has indicated that in certain, exceptional cases setoff may be available in railroad reorganizations. *In re Reading Co.,* 838 F.2d 686, 690 (3d Cir. 1988). The Third Circuit explained:

Where there is evidence suggesting that creditor's circumstances are fundamentally different from those of the other creditors in its class, setoff may well be appropriate. *See, e.g., Matter of Penn Central Transportation Co.,* 458 F.Supp. 1234, 1330 (E.D.Pa.1978) (Suggesting that a [creditor's] failure to invoke pre-bankruptcy setoff rights due to fraudulent representation made by the debtor might qualify as a circumstance exceptional enough to warrant post-petition setoff).

*Id.*

The court finds that the City does not indicate the existence of exceptional circumstances warranting an exception to the general rule prohibiting setoffs in railroad reorganizations.

The City claims that it deserves a setoff because the City does not have "fortuitous" claims. It states that its claims lack fortuity because they are derived from Reading's claims against it and are connected to the lease agreements. This rationale fails to comport with the Third Circuit's test. The City fails to prove that it was in a fundamentally different position than other creditors within its class. Such creditors also may have "unfortuitous" setoff claims. Moreover, this fortuity argument was rejected in a district court case cited with approval by the Third Circuit in its opinion. *See, In re Penn Central,* 458 F.Supp. 1234 (E.D.Pa.1978).

■ The City then argues that if it is not entitled to setoff, it is at least entitled to assert its contractual indemnification claims under the rubric of recoupment.[4] Unlike a setoff, in recoupment, the mutual obligations must arise from the same transaction. *Westinghouse Electric Corp. v. Fidelity & Deposit Co.,* 63 B.R. 18, 21 (E.D.Pa.1986). In fact, the Third Circuit has noted that "[i]n bankruptcy, the recoupment doctrine has been applied primarily where the creditor's claim against the debtor and the debtor's claim against the creditor arise out of the same contract."

*Lee v. Schweiker,* 739 F.2d 870, 875 (3d Cir.1984). Moreover, the Third Circuit stated that "[t]he fact that the same two parties are involved, and that a similar subject matter gave rise to both claims, however, does not mean that the two arose from the 'same transaction.'" *Id.* The court finds that Reading's statutory CERCLA claims and the City's contractual indemnification claims did not arise from the "same transaction."

Third and finally, the City claims that its indemnification claims are truly post-petition claims unaffected by the bankruptcy discharge. As the previous analysis makes clear, the City's claims are pre-petition, contingent claims. The City cannot escape the consequences of this conclusion by christening their contractual indemnification claims post-petition claims.

Because the court finds that the City's claims for contractual indemnification are barred by Reading's discharge, it need not interpret the scope of the contractual indemnification provisions at issue. Therefore, the court declines to do so.

*Title Ownership as a Security Interest*

The City makes a further argument in connection with the railcars that are the subject of the 1962 lease. It contends that it held title ownership of the railcars as a security interest.

CERCLA does contain a provision discussing security interests. The pertinent language reads, "Such term [owner or operator] does not include a person who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility." 42 U.S.C.A. § 9601(20)(A) (West Supp.1992).

■ In order for the City to fall within the secured creditor exemption to ownership liability, it must satisfy a two-prong test. First, the City must show that it owned the railcars primarily to protect its security interest in the railcars. Second, it must show that it did not participate

---

**4.** Because the court finds that the City is not entitled to recoupment, it will not decide if the

claim was asserted in an untimely fashion.

in the management of the railcars. The City has the burden of proof with regard to its claimed status as a secured creditor exempt from CERCLA liability. *United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1555 (11th Cir.1990); *United States v. First City Nat. Bank*, 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967) (holding that one claiming an exemption from a federal statute imposing liability bears the burden of proof on the issue).

■ Although CERCLA provides some protection to secured creditors, courts remain divided over the breadth of this protection. *In re Cuyahoga Equipment Corp.*, 980 F.2d 110, 118 (2d Cir.1992). At this juncture, the court need not resolve this difficult question. Reading has shown the existence of a genuine issue of material fact concerning whether the City held an indicia of ownership of the railcars **primarily** to protect its security interest and whether the City participated in the management of the railcars.

In support of its contention that it retained title ownership to the railcars primarily to protect its security interest in them, the City cites only one case—*In re Bergsoe Metal Corp.*, 910 F.2d 668 (9th Cir.1990). The facts of that case are as follows. Bergsoe Metals approached the Port of St. Helens, a municipal corporation formed pursuant to the laws of Oregon, about constructing a lead recycling facility in St. Helens. Pursuant to a negotiated agreement, the Port issued industrial development revenue bonds and pollution control revenue bonds to provide funding to purchase the land and construct the recycling plant.

The Port sold 50 acres of land to Bergsoe Metals. The recycling plant was to be constructed on that land. For its part, Bergsoe, in return, gave the Port a promissory note for $400,000 and a mortgage on the land.

The financing arrangement for the plant's construction involved a number of transactions and centered on the bonds issued by the Port. The United States National Bank of Oregon held the bonds in trust for the bondholders. Bergsoe received all proceeds from the Port's sale of the bonds and in return was required to pay an amount equal to the principal and interest owed to the bondholders.

Bergsoe and the Port entered into a "sale-and-lease-back" agreement. Bergsoe conveyed a warranty deed for the plant and the land on which it sat to the Port. The Port and Bergsoe become parties to two leases covering the plant and the land. Pursuant to these leases, Bergsoe was to construct the plant and pay all rents on the leases to the Bank. The rent equaled the combined total of the principal and the interest due on the bonds. Further, once the bonds were paid in their entirety, the lease granted Bergsoe the option to purchase the plant and land for $100.

The Port and the Bank entered into a transaction involving two mortgages and indentures of trust that corresponded to the two leases between the Port and Bergsoe. The Port issued the revenue bonds and then mortgaged to the Bank, in its capacity as trustee of the bondholders, the recycling plant and the land. Additionally, the Port assigned to the Bank its rights, including the rights to receive revenue, under the two leases with Bergsoe. In turn, the Bank held the revenue produced from the issuance of the bonds in a construction fund that was to be turned over to Bergsoe. Under the terms of the indentures, the Bank was required to collect rent under the leases and put the money toward paying off the bonds.

The Bank not only acted as trustee to the bondholders, it also purchased the bonds. In consideration for the purchase by the Bank, the Port subordinated its rights under the $400,000 promissory note to the Bank's rights under the two leases. Additionally, the Port placed in escrow the warranty deed, bills of sale, and UCC release statements. The Bank was instructed by the Port to deliver these items to Bergsoe when it executed its option to purchase the plant and the land.

In this case, the Port claimed that although it held paper title to the recycling plant, it held this indicia of ownership primarily to protect its security interest in the

plant. The Ninth Circuit agreed with this analysis. *Bergsoe,* 910 F.2d at 671. However, there are essential differences between *Bergsoe* and the facts of the instant case that prevent this court from granting summary judgment on the issue.

First, the City fails to note an important portion of the Ninth Circuit's decision in *Bergsoe.* The court concluded that the Bank, not the Port, truly financed the construction of the recycling plant. The Ninth Circuit explained:

> Essentially the Bank financed the Bergsoe plant; the Port's only involvement was to give its approval to the project and to issue the bonds that served as the vehicle for the financing. The Port received the warranty deeds as part of a transaction whose sole purpose was to provide financing for the plant.

910 F.2d at 671.

The City correctly states that the railcars which were the subject of the 1962 lease were purchased by the City with revenues raised through the issuance of public bonds, Reading's obligation to pay rent terminated with the final payment on the bonds, and Reading, at the close of the lease, could purchase the railcars for a nominal sum. However, the City cannot claim the kind of detachment from the transaction that the Port had. Although this hardly proves that the City was an owner, it does illustrate the City's misplaced reliance on a case involving a far more complicated financial transaction that served to substantially distance the Port from the recycling plant.

Second, Reading offers evidence that creates a genuine issue of material fact concerning whether the City held title to the cars primarily to protect a security interest. Because of widespread confusion over the scope and coverage of the secured creditor's exemption, the Environmental Protection Agency recently promulgated a regulation addressing the exemption's interpretation. 40 C.F.R. 300.1100 (1992).

Specifically, the regulation sheds some light on the meaning of the term "primarily to protect a security interest." Section 300.1100 states:

> Primarily to protect a security interest for the purposes of section 101(20)(a) of CERCLA means that the holder's indicia of ownership are held primarily for the purpose of securing payment or performance of an obligation.... Primarily to protect a security interest does not include indicia of ownership held primarily for investment purposes, nor ownership indicia held primarily for purposes other than as protection for a security interest. A holder may have other, secondary reasons for maintaining indicia of ownership, but the primary reason why any ownership indicia are held must be as protection for a security interest.

Evidence presented by Reading indicates that the City may not have held title ownership of the railcars "primarily to protect its security interest." For instance, the City purchased the railcars for the purpose of "improving service to attract ridership to support the downtown areas." Bailey dep. at 235–36. Moreover, consultants hired by the City, as well as City employees, participated in the preparation of specifications for the railcars. Bailey dep. at 236–37.

Reading has also shown that there is a genuine issue of material fact concerning the City's participation in the management of the railcars. For instance, the City's transit engineer set train schedules. Bailey dep. at 206, 230–31. Furthermore, the terms of the lease agreement between Reading and the City stated that the railcars should be used "primarily" on the lines subsidized by the City. Exhibits to the City's Motion, Exhibit E at 6.

*Owner or Operator Status*

According to the 1962 lease between Reading and the City, the City owned the 17 new "Silverliner II" railcars that were the subject of that lease. As a complement to its subsidy program, the City believed that it was important to update Reading's aging fleet of railcars. Bailey Dep. 235. Not only did the City purchase new railcars, some of its employees, aided by a retained consultant, participated in the preparation of the specifications to be used by the manufacturer of the railcars. Bailey Dep. at 236–37.

In 1971, SEPTA and Reading entered into a lease agreement in which SEPTA leased 14 new "Silverliner IV" railcars to Reading. A number of parties including the City, the Counties, Reading, the state of Pennsylvania, and the federal government provided funds to SEPTA so that it could purchase the railcars. SEPTA, in turn, leased the railcars to Reading. The City held an undivided fractional interest in each of the railcars.

Later between 1975 and 1977, SEPTA purchased another 88 "Silverliner IV" railcars. The majority of these railcars were delivered after Reading turned over its service to Conrail in 1976. A draft stipulation by the parties indicates that the City owned 60 of these railcars. Exhibit I, City's Motion for Summary Judgment. No lease agreements or other documentation has been provided to the court with respect to these railcars. The City does not mention these railcars in its papers.

The facts set forth above create a genuine issue of material fact concerning the ownership of the railcars. Furthermore, as the discussion *infra* at pages 907–09 illustrates, there exists a genuine issue of material fact as to what entity operated the railcars. Therefore, the court cannot grant the City's motion for summary judgment on the basis that it was neither an owner nor an operator of these railcars.

■ The City maintains that even if it owned or operated the railcars, it does not fall within the ambit of § 9607(a)(2). According to the City, this provision of CERCLA does not impose liability on former owners or operators of facilities that emitted hazardous substances. The court disagrees with this interpretation of § 9607(a)(2).

Under 42 U.S.C.A. § 9607(a)(2) a covered person is "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." In its Memorandum Opinion of December 16, 1992, this court, based upon its initial reading of this statutory language, stated in dictum that ownership of a facility that emitted hazardous substances would not

impose liability under the owner or operator prong of § 9607(a). In light of briefing by the parties and careful consideration of the issue, the court finds its initial interpretation of § 9607(a)(2) to be unduly restrictive given the relevant statutory language, applicable case law, and the expansive interpretation generally given to CERCLA provisions by the courts.

■ First, the court will examine the statutory language. As defined in CERCLA, the term facility encompasses rolling stock, such as railcars. 42 U.S.C.A. § 9601(9) (West Supp.1992). As explained in detail *supra* at page 898, the term disposal includes spills and leaks. For the purposes of this motion, it is clear that the City owned or operated a facility, the railcars. It is also clear that a hazardous substance was disposed of. The key question then is the interpretation of the phrase "at which." In other words—were the railcars a facility "at which" the PCBs leaked?

Webster's Third New International Dictionary (1981) defines "at" as follows:

1. used as a function word to indicate presence in, on, or near.

Given the definition of "at," it can easily be said that disposals occurred at the railcars. Thus, the statutory language supports the conclusion that § 9607(a)(2) encompasses situations involving operation or ownership of a facility that emitted hazardous substances.

Furthermore, there exists case law that supports this reading of § 9607(a)(2). *See, FMC Corp. v. United States Dept. of Commerce*, 786 F.Supp. 471 (E.D.Pa.1992) (imposing ownership liability under CERCLA on the United States government, in part, based upon its ownership of installations, equipment, pipes and/or pipelines from which hazardous substances were released).

Lastly, courts have interpreted CERCLA broadly in order to achieve Congress' goals in passing the legislation. *See, for e.g., U.S. v. Alcan Aluminum Corp.*, 964 F.2d 252, 258 (3d Cir.1992). Therefore, the court believes that it is inappropriate to

interpret § 9607(a)(2) in an overly restrictive fashion.

*Arranger Status*

█ Reading also seeks to impose arranger liability on the City in connection with the railcars in question. Because the court cannot say that as a matter of law, the City was not an arranger, the court must deny the City's motion for summary judgment on this issue.

In support of its motion for summary judgment, the City cites one case, *General Electric Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281 (2d Cir.1992). In that case, a waste oil company picked up waste oil from numerous customers, including General Electric, and scavenged waste oil from various garages and service stations. The waste oil was then disposed of at a disposal site. The waste eventually leaked into the soil and water. General Electric sought to hold the oil companies that leased service stations and sold oil products to some of the service station defendants liable as arrangers. The lease agreements between the oil companies and the service stations required the stations to keep certain hours, maintain the facilities in a certain manner, and to buy certain amounts of the oil company's products.

In *General Electric*, the Second Circuit stated a test for the imposition of arranger liability:

> Congress employed traditional notions of duty and obligation in deciding which entities would be liable under CERCLA as arrangers for the disposal of hazardous substances. Accordingly, this court concludes that it is the **obligation** to exercise control over hazardous waste disposal, and not the mere ability or opportunity to control the disposal of hazardous substances that makes an entity an arranger under CERCLA's liability provision.

*Id.* at 286 (emphasis in original).

In this case, the Second Circuit found that the oil companies were not arrangers because they neither owned the hazardous material nor controlled the process by which the waste oil was generated. The oil companies did not require that the service stations change oil, the source of the waste oil that eventually contaminated the environment. *Id.* at 287.

If indeed this is the appropriate legal standard for determining arranger liability, based upon the facts presented to this court, the City cannot be granted summary judgment based on the Second Circuit's statement of the law. Obviously, the facts presented to this court are quite different from those discussed above. For reasons explained in earlier portions of this opinion, this court cannot hold that the City was not the owner of the railcars in question. By virtue of its ownership of the railcars, the City can be considered the owner of the PCBs which leaked from inside the electrical transformers that were a part of each railcar. Moreover, unlike the lease agreements in the *General Electric* case, the lease agreements at issue in this case provided that the railcars would be utilized for Reading commuter service. At a minimum, this illustrates some control over the process generating the waste—the running of the railcars. If it is eventually determined that the City owned the cars or controlled their operation, the City had an obligation to exercise control over hazardous waste disposal.

## VIII. Was the City an operator or arranger by virtue of its subsidy arrangements with Reading?

First the court will discuss the issue of operator status. Then, arranger liability in the context of the subsidy arrangements will be discussed.

Although the City did not utilize a chronological analysis in its summary judgment motion, the court will employ one in this portion of its opinion. Determining if the City incurred CERCLA liability through its subsidy arrangements mandates an analysis of the evolving relationships between the pertinent entities.

The court distilled the City's arguments against the imposition of operator liability as follows. First, the City claims that it cannot be an operator because it had no authority to compel Reading to enter into

service contracts or to accept any contract terms proposed by the City. Second, the City contends that there is no evidence of the high degree of actual involvement or authority over Reading's commuter operations required for the imposition of CERCLA liability on the City. The discussion in the following pages will illustrate that the City's first argument fails because it is an inaccurate statement of the law and the City's second argument founders because, except for the SEPTA years, there is a genuine issue of fact over the degree of the City's involvement in or control over Reading's commuter service.

▆▆▆ Neither the Supreme Court nor the Third Circuit has enunciated standards for imposing operator liability under CERCLA. Although a multitude of other courts have addressed the issue of operator liability under the statute, no universal formula for determining operator status has emerged. However, the one recurring theme that does emerge from a canvassing of cases discussing operator liability is that "courts have broadly construed ... 'operating' in order to effectuate the perceived intent of Congress that liability under Section 107(a) should extend to all who profit from the treatment or disposal of hazardous waste." Susan M. Cooke, The Law of Hazardous Waste § 14.01[5][c] (1987 and 1992 Supp.). At the same time, courts have been careful not to read CERCLA as creating unlimited liability for those only tangentially or remotely involved with hazardous substances.

Some courts have fashioned specific definitions of operator. In *Kaiser Aluminum & Chemical Corp. v. Catellus Dev. Corp.*, the Ninth Circuit stated that "'operator' liability under section 9607(a)(2) only attaches if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment." 976 F.2d 1338, 1341 (9th Cir.1992) (Contractor hired to excavate land and who spread contaminated soil over uncontaminated soil in the process could be operator under CERCLA because the contractor "had sufficient con-

trol over this phase of the development."). A Michigan district court noted:

The most commonly adopted yardstick for determining whether a party is an owner-operator under CERCLA is the degree of control that party is able to exert over the activity causing the pollution.

*CPC Int'l Inc. v. Aerojet–General Corp.*, 731 F.Supp. 783, 788 (W.D.Mich.1989). The linchpin for imposing operator liability in the cases cited above appears to be control over the pollution producing activity.

Other courts analyzing CERCLA operator liability have focused on actual participation in the management of a facility. For example, a district court in California stated:

an individual cannot be liable as an "operator" under CERCLA Section 107(a)(2) unless that individual actually participates in the operation of the facility at which hazardous substances are disposed of, exercises control over the company immediately responsible for the operation of that facility, or is otherwise intimately involved in that company.

*Levin Metals Corp. v. Parr–Richmond Terminal Co.*, 781 F.Supp. 1454, 1457 (N.D.Cal.1991); *see also, Redland Soccer Club, Inc. v. Department of the Army*, 801 F.Supp. 1432, 1437 (M.D.Pa.1992) ("[T]o be held liable as an operator, a party must currently participate in decisions regarding the overall operations at a facility.")

What the court is required to do in considering the City's summary judgment motion is to determine if there are genuine issues of material fact and, if not, whether the City is entitled to judgment as a matter of law.

### Period prior to September 1961

Reading claims that commencing in 1958 the City became an operator of its passenger rail service through its subsidization of Reading. Complaint ¶ 109. In support of its contention, Reading produces the following facts.

In 1958, the City embarked upon "Operation Northwest." As a part of this operation, the City paid Reading to operate a certain level of passenger service on its

Chestnut Hill line at fares fixed by the City. Warden Decl. at ¶ 6. The City's transit engineer set the schedules for train service on Operation Northwest. Bailey dep. at 206.

Soon, the City began subsidizing other commuter lines. In "Operation Northeast," the City commenced subsidization of service to Reading's Fox Chase station. As in Operation Northwest, the City set fares and the city engineer set train schedules. Bailey Dep. at 230–31. Later, the City paid to have the Operation Northeast lines electrified. Bailey dep. at 233–34.

By the early 1960's all of Reading's lines located completely within the city of Philadelphia were subsidized. Warden Decl. at ¶ 9. The City became involved in advertising the Reading commuter lines. Reading's Appendix I, Exhibit E. Furthermore, the City, through the PSIC, had personnel at Reading facilities and riding on Reading trains. Bailey Dep. at 225, 250.

Given the case law and the facts set forth above, the court finds that genuine issues of material fact exist regarding the level of the City's involvement with and authority over Reading's commuter operations during this period. The court cannot say, as a matter of law, that the City was not an operator during this time period.

*The SEPACT period, September 1961 through October 1966*

Pursuant to the analysis set forth on pages 13–20 of its Memorandum and Order of December 16, 1992, the court denies the City's motion for summary judgment with respect to the SEPACT years. The City has offered no evidence suggesting that its position in relation to SEPACT differs from that of Bucks, Chester, and Montgomery Counties. Therefore, the court has no reason to depart from its earlier analysis.

*The SEPTA period, November 1966 through 1976*

■■ Applying the analysis set forth in pages 20–30 of its Memorandum and Order of December 16, 1992, the court grants the City's motion for summary judgment on

the issue of operator liability through its subsidy of Reading's commuter service during the SEPTA period. In its brief, Reading claims that the City was in a fundamentally different position from the Counties because it exerted dominating power over SEPTA. However, Reading offers only one piece of evidence concerning this "dominating power." In connection with the 1971 railcar purchase by SEPTA, the City pressured SEPTA to give it an undivided interest in the railcars purchased in exchange for the City providing a portion of the purchase price. Bailey Dep. 178–180. This evidence does not show that the City was in a fundamentally different position from the Counties.

Finally, the court must address the issue of arranger liability in connection with the subsidizing relationship between the City and Reading. In its briefs, the City did not differentiate between liability connected to the railcars and liability connected to the subsidy arrangements when making its arguments against the imposition of arranger liability. Therefore, the discussion *supra* at page 907 and the discussion on page 907 of the court's previous opinion both apply here.

Under the *General Electric* case cited by the City, the court cannot conclude that the City was not an arranger for the disposal of hazardous substances between 1958 and the formation of SEPTA in November 1966. However, during the SEPTA years, the City cannot have been an arranger because the basis of Reading's claim of liability during that period was that SEPTA was simply a sham through which the City controlled Reading. Since the court rejects this contention, it must grant the City's motion for summary judgment on any alleged arranger liability based on its subsidy of Reading's commuter operations through SEPTA.[5]

### IX. Conclusion

For the reasons set forth above, the City's motion for summary judgment is granted in part and denied in part. Read-

---

5. However, this holding does not exonerate the City from possible arranger liability in connec-

tion with the railcars that it owned, even if this ownership occurred during the SEPTA period.

ing's cross-motion for summary judgment is granted. An appropriate order follows.

### ORDER

**AND NOW,** this 9th day of March 1993, upon consideration of defendant City of Philadelphia's motion for summary judgment and plaintiff's response thereto and cross motion for summary judgment, **IT IS HEREBY ORDERED THAT:**

1) Defendant City of Philadelphia is granted summary judgment on Count VII of the plaintiff's first amended complaint for the time period following October 1966.

2) Defendant City of Philadelphia is denied summary judgment on all other issues.

3) Plaintiff is granted summary judgment on the issue of the discharge of the City's contractual indemnification claims.

### MEMORANDUM AND ORDER ON RECONSIDERATION

The City of Philadelphia (the "City") has filed a motion for partial reconsideration of this court's March 9, 1993 order granting in part and denying in part the City's motion for summary judgment. Specifically, the City asks the court to reconsider its decision that the City's alleged contractual right to indemnification pursuant to railcar lease agreements between it and Reading was not cognizable by way of recoupment to reduce Reading's CERCLA claims against the City. For the reasons set forth below, the court denies the motion.

### DISCUSSION

In its March 9, 1993 order, the court found that Reading's statutory CERCLA claims and the City's contractual indemnification claims did not arise from the same transaction and therefore the City could not assert its contractual indemnification claims against Reading by way of recoupment. March 9, 1993 Order at 903. The City maintains that its contractual indemni-

fication claims arise from the same transaction as Reading's CERCLA claims against it. The court disagrees.[1]

In the bankruptcy context, recoupment is "the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." 4 Lawrence P. King, Collier on Bankruptcy ¶ 553.03 (15th ed. 1993). Recoupment is an equitable doctrine and both its equitable and defensive nature justify permitting a creditor to assert recoupment claims "against prepetition debts to the debtor, postpetition debts, or some combination of these." 2 William L. Norton, Jr., Norton Bankruptcy Law and Practice § 33.02 (1981).

The City agrees that in the bankruptcy context in order for a creditor to assert a recoupment claim against a debtor, both the claims of the creditor and the debtor must arise from a "single integrated transaction." The Third Circuit delineated the relevant standard to be applied as follows:

[w]e find that the open-ended standard, endorsed in the context of discerning compulsory counterclaims, is inadequate for determining whether two claims arise from the same transaction for the purposes of equitable recoupment in bankruptcy.... For the purposes of recoupment, **a mere logical relationship is not enough:** 'the fact that the same two parties are involved, and that a similar subject matter gave rise to both claims, ... does not mean that the two arose from the same "transaction." '

*Id.* at 1081 (citation omitted) (emphasis added).

*In re University Medical Center,* 973 F.2d 1065 (3d Cir.1992).

In order for the equitable doctrine of recoupment to apply, "both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *Id.* According to the City, the single, inte-

---

**1.** Since the court finds that recoupment does not apply to the facts presented, the court need not decide whether the recoupment claims were discharged in Reading's bankruptcy.

grated transaction from which both Reading's CERCLA claims and the City's claims for contractual indemnification arise is "the City's alleged ownership and control over certain leaking railcars." City's Motion at 11.

The City's application of the term single, integrated or same transaction is at odds with the meaning of the term as used by the Third Circuit and other courts. In cases recognizing a right to recoupment in the bankruptcy context, either the creditor has made some type of overpayment to the debtor or both the creditor and the debtor have claims arising from a single contract.

In *University Medical*, the Third Circuit explained that the "typical situation in which equitable recoupment can be invoked involves a credit and debt arising out of a transaction for the same goods and services." *Id.* at 1081. In that same case, the Third Circuit noted that "recoupment had often been applied where the relevant claims arise out of single contract 'that provide[s] for advance payments based on estimates of what ultimately would be owed, subject to later correction.'" *Id.* at 1080 (citation omitted). However, an express contractual right is not necessary for recoupment. *Id.* At the same time, a contractual agreement does not guarantee a right to recoupment. *Id.*

On the facts of the case before it, the Third Circuit held that Medicare overpayments made by the government to the University Medical Center in 1985 did not arise from the same transaction as Medicare payments due to the University Medical Center for services rendered in 1988. *Id.* at 1081. The Third Circuit reasoned that the 1988 payments were independent of the 1985 payments and the contract between the parties required that any debt created by overpayments or underpayments be calculated on an annual basis. The mere fact that the two parties had an ongoing relationship did not create a single, integrated transaction as required for recoupment. *Id.*

In *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir.1984), the Third Circuit noted that:

[t]he justification for the recoupment doctrine is that where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim, against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable.

In *Lee*, the Social Security Administration (the "SSA") claimed that it had a right to recoup overpayments made to social security recipient Lillie Lee prior to her filing for bankruptcy. In order to recover the overpayment, the SSA had reduced her benefits. Following her petition for bankruptcy, Lee attempted to recover the deducted amounts from the SSA.

The district court found that Lee's debt to the SSA and the SSA's debt to Lee arose out of the same transaction—"[s]ocial security benefits due to Lillie Lee." The Third Circuit rejected this analysis noting that recoupment usually applies when the debtor's claim and the creditor's claim arise out of the same contract. *Id.* at 875. The Third Circuit concluded that since welfare benefits are "'entitlements' rather than contractual rights, the "SSA may not recoup previous overpayments from benefits payable after a bankruptcy petition is filed." *Id.* at 876.

Other cases addressing the equitable doctrine of recoupment are equally inapposite to the case at hand. *See, e.g., Westinghouse Electric Corp. v. Fidelity and Deposit Co.*, 63 B.R. 18 (E.D.Pa.1986) (holding that more than one series of transactions existed when selling arrangement changed from one whereby debtor, as a dealer for creditor, billed its customers directly into one whereby creditor billed debtor's customers directly and then paid debtor a commission); *In re Clowards, Inc.*, 42 B.R. 627 (Bankr.D.Idaho 1984) (holding that where debtor had failed to complete construction contracts that it entered into creditors from whom the trustee sought to recover the amount due on the contract could reduce, by way of recoupment, any amount owed to debtor by the amount of damage suffered as a result of debtor's breach); *In re Davidovich*, 901 F.2d 1533, 1539 (10th Cir.

1990) ("courts have generally only found this 'same transaction' requirement to be satisfied when the debts to be offset arise out of a single, integrated contract or similar transaction").

The facts of the case before this court do not mesh with the meaning of same or single, integrated transaction as courts have applied it. Moreover, the City does not point to a single, integrated *transaction,* in the ordinary sense of the word, that gives rise to both Reading's CERCLA claims and the City's claims for contractual indemnification under the railcar lease agreements.

Black's Law Dictionary 1496 (6th ed. 1990) defines transaction as follows:

> Act of transacting or conducting any business; between two or more persons; negotiation; that which is done; an affair. An act, agreement, or several acts or agreements between or among parties whereby a cause of action or alteration of legal rights occur. (citation omitted) It may involve selling, leasing, borrowing, mortgaging, or lending. Something which has taken place, whereby a cause of action has arisen. It must therefore consist of an act or agreement, or several acts or agreements having some connection with each other, in which more than one person is concerned, and by which the legal relations of such persons between themselves are altered. It is a broader term than 'contract.'

The definition of transaction cited above indicates that a transaction requires some type of volitional behavior on the part of all parties to the alleged transaction. The court cannot discern any such transaction that gives rise to both Reading's CERCLA claims and the City's claims for contractual indemnification. The City's alleged ownership and operation of railcars that leaked PCBs, which the City characterizes as a transaction, is more appropriately described as a set of facts common to both Reading's and the City's claims. A set of common facts differs substantially from a single transaction or a single series of transactions that gives rise to both a debt-

or's and a creditor's claims against each other.

The court recognizes that this outcome may seem unfair. Clearly, the purpose behind the doctrine of recoupment is to rectify some of the inequities that may result from a bankruptcy filing. *See,* 2 William L. Norton, Jr., Norton Bankruptcy Law and Practice § 33.02 (1981); *In re B & L Oil Co.,* 782 F.2d 155 (10th Cir.1986) (Where overpayments were made by mistake, the court applied the equitable doctrine of recoupment to prevent unjust enrichment, even though two independent transactions were involved.).

However, the facts presented do not justify the allowance of recoupment because there is no single, integrated transaction between Reading and the City giving rise to the City's claims for contractual indemnification and Reading's CERCLA claims. Furthermore, the rationale motivating courts to allow recoupment in the bankruptcy context does not apply in the present case. For instance, the rationale behind cases allowing creditors to recoup prepetition overpayments from amounts owed to the debtor post-petition "is based on the treatment of executory contracts in bankruptcy: debtor may not assume the favorable aspects of a contract (post-petition payments) and reject the unfavorable aspects of the same contract (the obligation to repay pre-petition overpayments by means of 'recoupment')." *Lee,* 739 F.2d at 876; *see also, In re Hiler,* 99 B.R. 238, 244 (Bankr.D.N.J.1989).

For the reasons set forth above, the court denies the City's motion for partial reconsideration.